

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-5-2000

# DeHart v Horn

Precedential or Non-Precedential:

Docket 99-3072

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"DeHart v Horn" (2000). *2000 Decisions.* Paper 2.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/2

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 3, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-3072

ROBERT PERRY DEHART
Appellant

v.

MARTIN HORN, Commissioner of Corrections;
JAMES S. PRICE, Superintendent of SCI Greene;
UNITED STATES OF AMERICA

On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civil Action No. 95-cv-01238)
District Judge: Honorable William L. Standish

Argued July 27, 1999

BEFORE: SCIRICA and STAPLETON, Circuit Judges,
and GREEN,* District Judge

(Opinion Filed January 3, 2000)

_____

* Honorable Clifford Scott Green, Senior United States District Judge for
the Eastern District of Pennsylvania, sitting by designation.

Edward A. Olds (Argued)
1007 Mount Royal Boulevard
Pittsburgh, PA 15223
 Attorney for Appellant

J. Bart DeLone (Argued)
Office of Attorney General
 of Pennsylvania
15th Floor, Strawberry Square
Harrisburg, PA 17120
 and
Rodney M. Torbic
Office of Attorney General
 of Pennsylvania
6th Floor, Manor Complex
Pittsburgh, PA 15219

 Attorneys for Appellees

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Plaintiff-Appellant, Robert P. DeHart ("DeHart"), an inmate at the Pennsylvania State Correctional Institute ("SCI") at Greene, commenced this civil rights action against Martin Horn, Commissioner of the Department of Corrections of Pennsylvania, and James Price, Superintendent of SCI at Greene (collectively "the prison" or "prison officials"), as a result of their failure to provide him with a diet consistent with his Buddhist religious beliefs. DeHart appeals the final order of the District Court, granting the defendants' motion for summary judgment. He insists that the defendants' failure to accommodate his religious belief, which requires him to follow a vegetarian diet, violates both his right to free religious expression under the First Amendment and his right to equal protection of the law under the Fourteenth Amendment. We will reverse the judgment of the District Court and remand the case for further proceedings consistent with this opinion.

I.

DeHart is currently serving a life sentence at SCI at Greene. Since his incarceration, he, with the assistance of the City of 10,000 Buddhas, a center of Buddhist teaching, has taught himself Buddhism. Based on his own reading of the Sutras, which are Buddhist religious texts, DeHart became a vegetarian. DeHart testified before the District Court that the First Precept in Buddhism prohibits the killing of any living thing, and he has interpreted that Precept as requiring that he follow a vegetarian diet. The prison officials do not challenge the sincerity of DeHart's beliefs. They do, however, challenge whether vegetarianism is a central tenet of any recognized Buddhist sect.

A brief overview of the process by which Pennsylvania prisons provide meals to inmates is necessary for a proper understanding of DeHart's request. Pursuant to a master menu, all inmates at SCI Greene receive the same meals. The food for those meals is obtained through bulk purchases. Those inmates whose health requires dietary modifications or restrictions receive a therapeutic diet. In order for an inmate to receive a therapeutic diet, however, it must be prescribed by an institution doctor. The therapeutic diet consists of the same foods (in different proportions) that are served on the master menu. The therapeutic meals are prepared individually, and all inmates who have been prescribed a therapeutic diet eat together in one dining hall after it has been cleared of the other inmates.

DeHart proposes that he be served a vegetarian meal when other inmates are served the therapeutic meals. DeHart secured the affidavit of a dietician, who averred that DeHart's nutritional needs could be satisfied by doubling the portions of vegetables and grains already served and then adding an eight-ounce cup of a soy-based milk product at each meal.1 The cost of this supplement, which
_____

1. As the affidavit of DeHart's dietician notes, his proposed diet does not
meet the Recommended Daily Allowance ("RDA") standards for Vitamin D, riboflavin, B-6, and zinc as set forth by the National Academy of Sciences and adopted by the American Correctional Association. As she

3

is not currently purchased by the Department of Corrections ("DOC"), would be $1.71 per day.2

On June 17, 1995, DeHart submitted a written grievance, requesting a diet that comports with his religious beliefs. That grievance was denied, and DeHart appealed the denial to Superintendent Price, who concurred in the result. The denial was again upheld on appeal by the DOC Central Office Review Committee. DeHart then filed this suit pursuant to 42 U.S.C. S 1983.

A preliminary injunction hearing was held before a Magistrate Judge, who found that vegetarianism is not mandated by Buddhism and, for that reason, recommended that DeHart be denied preliminary relief. The District Court adopted the Magistrate Judge's recommendation. DeHart then appealed to this Court, and we affirmed the denial of preliminary injunctive relief. See DeHart v. Horn, No. 97–3048 (3d Cir. Aug. 25, 1997) (hereinafter "Memorandum Opinion"). In the Memorandum Opinion affirming the District Court's decision, this Court admonished the

_____

explained, it did provide more than two-thirds of the RDA standard in each instance, and these deficiencies did not cause her to qualify her opinion that the proposed diet was sufficient to meet DeHart's nutritional needs. The District Court made no findings regarding the significance, if any, of these deficiencies. The Pennsylvania DOC Food Services Administrative Directive requires that, for the master menu, a registered dietician verify that the diet "meets or exceeds the dietary allowances as stated in the [RDAs] . . . ." App. 652. For the therapeutic diets, however, the regulation merely requires that the diet "be designed and certified by a Registered Dietician as being nutritionally correct." App. 656. The regulation also provides that it "should be interpreted to have sufficient flexibility so as to be consistent with law . . . ." App. 657.
On remand, the District Court may find it necessary to determine how this Administrative Directive should be interpreted in a context like this.
If it should determine that the proposed diet is inconsistent with the Administrative Directive, however, the issue would remain whether under Turner v. Safley, 482 U.S. 78, 89 (1987), the prison rules and regulations as a whole, as applied to this case, are reasonably related to legitimate penological interests.

2. The dietician indicated that a day's supply of soy-based milk product would cost $1.71 if purchased in a supermarket and would cost less if purchased directly from a distributor.

4

District Court not to interject itself into Buddhist doctrinal disputes: "We agree with [DeHart] that the district court could properly determine only whether he sincerely held his religious beliefs, not whether his beliefs are doctrinally correct or central to a particular school of Buddhist teaching." Memorandum Opinion at 2 (citing Employment Division v. Smith, 494 U.S. 872, 886-87 (1990)).

On remand, the parties engaged in additional discovery, and cross-motions for summary judgment were filed. The Magistrate Judge recommended that summary judgment be granted in favor of the prison officials. DeHartfiled objections to the Magistrate Judge's Report and Recommendation, arguing, inter alia, that the Magistrate Judge ignored this Court's instructions and again based his opinion on a finding that vegetarianism is not a central tenet of the Buddhist religion. The District Court adopted the Report and Recommendation over that objection, and this appeal followed.

II.

The District Court had jurisdiction over this case, pursuant to 28 U.S.C. S 1331, and this Court has jurisdiction over the present appeal pursuant to 28 U.S.C. S 1291. We exercise plenary review over the District Court's decision to grant summary judgment. See Wicker v. Consol. Rail Corp., 142 F.3d 690, 696 (3d Cir. 1998). Summary judgment is appropriate only if there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c). In our review, we must view all evidence and draw all inferences therefrom in the light most favorable to the nonmoving party. See Wicker, 142 F.3d at 696.

III.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I. In Cantwell v. Connecticut, 310 U.S. 296, 303 (1940), the Supreme Court held that the First Amendment was incorporated by the Fourteenth Amendment and, thus,

5

applicable to the states. Although DeHart is incarcerated, the Supreme Court has made clear that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." Bell v. Wolfish, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, . . . including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Shabazz, 482 U.S. 342, 348 (1987) (citations omitted). Nevertheless, the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security require certain limitations on the exercise of constitutional rights by inmates. See Pell v. Procunier, 417 U.S. 817, 822-23 (1974).

In Turner v. Safley, 482 U.S. 78, 89 (1987), the Supreme Court articulated the standard for reviewing a prison regulation challenged on constitutional grounds: "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." This test is intended to effect an accommodation between two well-established principles. "The first of these principles is that federal courts must take cognizance of the valid constitutional claims of prison inmates." Id. at 84. The"second . . . is the recognition that `courts are ill equipped to deal with the increasingly urgent problems of prison administration' and [that] separation of powers concerns counsel a policy of judicial restraint." Id. at 84-85 (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)). Thus, while this standard of review requires a court to respect the security, rehabilitation and administrative concerns underlying a prison regulation, without requiring proof that the regulation is the least restrictive means of addressing those concerns, it also requires a court to give weight, in assessing the overall reasonableness of regulations, to the inmate's interest in engaging in constitutionally protected activity.

Turner goes on to provide guidance on how to apply its reasonableness standard. As we recently explained in Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999) (internal citations omitted):

6

[Turner] directs courts to assess the overall reasonableness of such regulations by weighing four factors. "First, there must be a `valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to render the policy arbitrary or irrational." Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

1. Rational Connection to Penological Interests

The prison asserts that two penological interests are served by denying DeHart's request for a vegetarian diet: (1) the interest in a simplified and efficient food service; and (2) the interest in avoiding possible resentment and jealousy on the part of other inmates. The District Court found that the denial of DeHart's religious diet was rationally related to those two legitimate, penological goals. Given the deference we must show to the reasoned judgment of prison officials and our recent decision in Johnson v. Horn, 150 F.3d 276 (3d Cir. 1998), we agree.

In Johnson, two Pennsylvania prison inmates sued prison officials, alleging a violation of their free exercise rights. The inmates were Jewish and were seeking a kosher diet in conformity with their religious beliefs. In that case, however, the prison officials conceded that the inmates were entitled to receive a kosher diet; the only issue was whether that diet had to consist of hot or cold meals. See id. at 281. This Court, thus, never addressed the fundamental issue in this case -- i.e., whether the prison is constitutionally required to serve a diet that conforms with DeHart's religious beliefs. Nevertheless, the Court's analysis is helpful here.

In Johnson, the Court specifically held that "[t]he Prison has a legitimate penological interest in keeping its food

7

service system as simple as possible." Id. at 282; see also Ward v. Walsh, 1 F.3d 873, 877 (9th Cir. 1993) (same); Kahey v. Jones, 836 F.2d 948, 949-50 (5th Cir. 1988) (same). We further observed that the inmates' "request for a [religious diet] creates legitimate security concerns, including bringing additional foods from new sources into the Prison and the possible belief by other inmates that [plaintiffs] are receiving special treatment." Johnson, 150 F.3d at 282.

Johnson, thus, forecloses any argument as to the legitimacy of a prison's interest in an efficient food system or in avoiding inmate jealousy; those interests are legitimate penological concerns under Turner. Moreover, we agree that the prison's refusal to grant DeHart's request for a religious diet bears some rational relation to those concerns. The fifty-five therapeutic trays prepared at each meal complicates the food service regimen of the prison, and preparation of additional special meals would add incrementally to the burden. Similarly, while the evidence indicates that the provision of therapeutic meals has never given rise to problems in the past, it is not irrational to think that providing DeHart with a vegetarian diet to accommodate his religious beliefs might involve some risk of inmate jealousy.

This determination commences rather than concludes our inquiry for two reasons. First, while a rational nexus between a regulation and a legitimate penological interest is essential to its validity, see Turner, 482 U.S. at 89-90, not all prison regulations that are rationally related to such an interest pass Turner's "overall reasonableness" standard. Turner, thus, calls for more than traditional rational basis review. As the remaining factors evidence, the Turner standard also takes into account the extent of the burden imposed by the regulation on an inmate's religious expression, as well as the impact that accommodating the inmate's constitutional claim would have on the entire prison community and its resources.

Second, Turner teaches that the "governmental objective must be [both] a legitimate and neutral one." Id. at 90 (emphasis added). The Court "found it important to inquire whether prison regulations restricting inmates' First

8

Amendment rights operated in a neutral fashion, without regard to the content of the expression." Id. DeHart brought to the District Court's attention the fact that the defendants in Johnson had urged a judge and a magistrate judge of the same court not to order them to provide kosher meals to Jewish inmates because the prison was voluntarily providing such a diet. DeHart further pointed out that the kosher diet being voluntarily provided consisted of milk, uncut fruit and vegetables, and a nutritional supplement, and that the cost to the prison for these kosher meals was substantially more than the cost of the liquid supplement diet he was requesting.3 The defendants comment on these facts only in response to DeHart's Equal Protection argument. Their sole response is: "In Johnson, the Court was presented with kosher laws that are a commandment of the Orthodox Jewish faith. . . . Here, vegetarianism while an expression of belief, is not a commandment of Buddhism." Appellees' Br. at 29.

While the District Court did not comment on the fact that the defendants were providing specially prepared kosher

_____

3. DeHart also called to the Court's attention the following observations of the District Court during the initial stage of the Johnson case:

> The facts as to which there is no genuine dispute may be summarized as follows: 1) keeping kosher is a religious obligation central to the practice of Orthodox Jews, including plaintiffs; 2) although there are increased dollar costs associated with accommodating a kosher diet, those costs are not significant in light of the nature of the diet which plaintiffs testified they could eat and remain kosher in accordance with the advice of their religious leaders; 3) there are no realistic grounds for believing that accommodating the plaintiffs' kosher diet will have any impact on the defendants' legitimate goals of maintaining institutional order and safety, and the marginal administrative costs of separating genuine from false claims that a prisoner is an Orthodox Jew who is required to keep kosher, in light of the administrative apparatus already in place in the Department of Corrections, is minimal.

> I conclude that there is a constitutional right for these plaintiffs as Orthodox Jews to keep kosher as described in the evidentiary record of this case, i.e., to a kosher diet not requiring the establishment of a separate kitchen or segregated handling procedures.

App. at 152.

meals with nutritional supplements to the Jewish inmates at greater cost, we assume that it must have accepted the distinction tendered by the defense. As we explain hereafter, the proffered distinction is untenable. If, on remand, the District Court can articulate no other reason why DeHart and the Jewish inmates are not similarly situated, it must enter judgment for DeHart. As we have noted, neutrality in the regulation of religious expression is a sine qua non of validity under Turner.4

2. Alternative Means of Religious Expression

This factor requires a court to focus on the burden that the regulation imposes on an inmate's ability to engage in constitutionally protected activity. Turner instructs that where " `other avenues' remain available for the exercise of the asserted right, . . . courts should be particularly conscious of the `measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.' " Turner, 482 U.S. at 90 (quoting Pell v. Procunier, 417 U.S. at 827). Conversely, where the regulation leaves no alternative means of exercising the asserted right, the inmate's interest in engaging in the prohibited activity is entitled to greater weight in the balancing process.

_____

4. We agree with the dissent that a court must examine whether the interest asserted as a justification for the regulation is "unrelated to the
suppression of expression." Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999) (quoting Thornburgh v. Abbott, 490 U.S. 401, 415 (1989)). The inquiry cannot stop there, however. As we have pointed out above, immediately after setting forth the "neutrality" requirement, the Turner Court stressed that it was "important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." Turner, 482 U.S. at 90 (emphasis added); see also Thornburgh, 490 U.S. at 420 (finding regulations facially valid under the Turner standard, but remanding "for an examination of the validity of the regulations as applied"). The fundamental inquiry under Turner is whether what the prison is doing is reasonably related to legitimate penological interests, and we are confident that the Court did not mean to suggest that such a relationship can exist where a prison, without substantial justification related to legitimate, penological interests, chooses to accommodate the religious dietary needs of Jewish inmates while refusing to accommodate an inmate of another faith.

In Johnson, we applied this teaching in the context of an asserted right to a diet in conformity with one's religious beliefs. There we contrasted situations involving alternative means of religious expression with situations involving religious commandments that the prison regulation requires the inmate to violate. We explained:

> [T]he importance of alternative means of religious observance is an irrelevant consideration when the belief at issue is a "religious commandment," rather than a "positive expression of belief." [ Ward v. Walsh, 1 F.3d 873, 878 (9th Cir. 1993)] (discussing Jewish kosher laws). As the United States Court of Appeals for the Ninth Circuit has stated: "It is one thing to curtail various ways of expressing belief, for which alternative ways of expressing belief may be found. It is another thing to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion." Id. As in Ward, the Inmates here are "defiling" themselves under the laws of kosher when forced to eat non-kosher foods. By acknowledging this, we do not intend to suggest that all "religious commandments" must be accommodated, whatever their costs to legitimate penological concerns. However, in such situations the centrality of the religious tenet carries greater weight and the existence of alternative means of observance is of no use in the ultimate balancing which Turner commands.

Johnson, 150 F.3d at 282.

The District Court erroneously interpreted the distinction we drew in Johnson as calling for an assessment of whether vegetarianism was a "central tenet" of Buddhism or some recognized sect thereof. In the course of its analysis, the Court relied heavily on the testimony of Richard McKinney, an expert in the doctrine and practices of Buddhism, at the preliminary injunction hearing. Based on that testimony, it made the following findings:

> Plaintiff practices Mahayana Buddhism, which is one of three major traditions of Buddhist practice, along with the Hinayana and Vajrayana traditions. . . . He

11

> has obtained information from the City of Ten
> Thousand Buddhists in this respect. Mr. McKinney
> spoke to two members of the Board of Directors for the
> City of Ten Thousand Buddhas immediately prior to
> the hearing in this matter, and they informed him that
> vegetarianism is a "branch, not a root of their
> particular approach to Buddhism."[5]

_____

5. Mr. McKinney gave the following explanation of the "branch, not root" concept:

> Q. What do you mean by that?
>
> A. By that I mean that it is not a root practice, it is a –– like a branch on a tree, it is a –– a practice that one can engage in. They
> happen to engage in that practice.
>
> Q. Who are they?
>
> A. Both the monk and the nun that I was talking about.
>
> Q. Are they within the City of Ten Thousand Buddhists?
>
> A. They're part of the organization.
>
> * * *
>
> Q. With the experience that you have, do you consider the strict vegetarian practice as it is practiced within the City of Ten Thousand Buddhas to be a high form of practice within Buddhism?
>
> A. I'm hesitating because the idea of higher or lower practice, in which I just said, is –– the root practices have to do with the precepts. The vegetarianism is not higher, it is just a practice which
> grows out of the precept of not harming.
>
> Q. Okay. Is vegetarianism mandated by Buddhism?
>
> A. No.

App. at 104–05.

On cross-examination, Mr. McKinney further testified:

> Q. Do some Buddhists practice vegetarianism as a matter of religious belief or conviction?
>
> A. Yes.

Q. Okay. And, in fact, isn't it the case that the-- that the monks or some people associated with the City of Ten Thousand Buddhas practice vegetarianism?

12

While supporting plaintiff 's right to pursue Buddhism
as plaintiff understands it, Mr. McKinney stated that
no one practice is an absolute necessity for Buddhism,
and that one should "practice what one is able to
practice within the environment and conditions that
one can." Mr. McKinney also opined that sutras are
guidelines, and that plaintiff is interpreting them"in a
very literalistic manner."

What the court is faced with, then, is a situation where
plaintiff may sincerely believe that he would defile
himself by not following the strict vegetarian diet he
has described. His belief, however, is clearly not shared
by any other Buddhist identified to the court, and is
specifically rejected as a "central" tenet by the very sect
of Buddhists to which plaintiff has appealed for
guidance in the past.

* * *

Since vegetarianism is neither a central part of
Buddhism, nor a commandment of that religion,
plaintiff 's wish to pursue vegetarianism must be
considered an expression of his faith as opposed to his
adherence to a religious commandment. This being the
case, the existence of alternative means of expression,
including prayer and possession of religious texts,
makes this factor one which weighs in the prison's
favor as well.

_____

A. Yes.

Q. And isn't it the case that at least some of the people in the
City
of Ten Thousand Buddhas perform the custom where they eat one
vegetarian meal before noon or early in the day and that's the only
meal that they eat?

A. There are many Teravadan monks who do the same.

Q. Okay. And that's a function of their religious conviction and
religious belief, is that correct?

A. It's a function of their religious practice.

App. at 106-07.

13

District Court Slip Op. at 16, 17 (internal citations omitted).

The District Court's reliance on the fact that DeHart's beliefs are not shared by others in the Buddhist religion is inconsistent with both Supreme Court caselaw and the precedent of this Court. As the Supreme Court cautioned in Employment Division v. Smith:

> "[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." Hernandez v. Commissioner, 490 U.S. [680,] 699 [(1989)]. Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.

494 U.S. 872, 886–87 (1990) (plurality opinion). Although the Court was divided in Smith, the concurring and dissenting opinions both expressly agreed with the majority's admonition. See id. at 906 (O'Connor, J., concurring) ("I agree with the Court . . . [that] `[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith.' ") (quoting Hernandez); id. at 919 (Blackmun, J., dissenting) ("I agree . . . that courts should refrain from delving into questions whether, as a matter of religious doctrine, a particular practice is `central' to the religion").

Smith is not an aberration. Rather, it is part of a consistent and resounding theme echoed throughout many Supreme Court opinions. See Thomas v. Review Bd. of Indiana Employment Security Div., 450 U.S. 707, 715–16 (1981) ("[T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. . . . [I]t is not within the judicial function and judicial competence to inquire [who has] more correctly perceived the commands of their common faith."); Jones v. Wolf, 443 U.S. 595, 602–06 (1979); Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church, 393 U.S. 440, 450 (1969) ("the First Amendment forbids . . . courts from . . . assessing the relative significance to the religion of the tenets"); United States v. Ballard, 322 U.S. 78, 85–87 (1944).

14

The course to be followed in a case of this kind was charted by this Court in Africa v. Pennsylvania, 662 F.2d 1025 (3d Cir. 1981), which also involved an inmate's request for a special diet said to be mandated by the Free Exercise Clause. The inmate was a member of MOVE, " `a revolutionary' organization, `absolutely opposed to all that is wrong.' " Id. at 1026. We there posed the issues for decision as follows:

> The relevant case law in the free exercise area suggests that two threshold requirements must be met before particular beliefs, alleged to be religious in nature, are accorded first amendment protection. A court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things. United States v. Seeger, 380 U.S. 163, 185, 85 S. Ct. 850, 863, 13 L.Ed.2d 733 (1965); Callahan v. Woods, 658 F.2d 679 (9th Cir. Oct. 5, 1981). If either of these two requirements is not satisfied, the court need not reach the question, often quite difficult in the penological setting, whether a legitimate and reasonably exercised state interest outweighs the proffered first amendment claim.

Africa, 662 F.2d at 1029-30. It was clear that Africa's beliefs were sincerely held. We concluded, however, that those beliefs were not "religious in nature" and, accordingly, we had no occasion to reach the issue of whether the state's legitimate interest outweighed the proffered free exercise claim.

When we explained the necessity of finding a sincerely held belief, we were careful in Africa to stress that the case law did not require a finding of an orthodox belief:

> Judges are not oracles of theological verity, and the Founders did not intend for them to be declarants of religious orthodoxy. See United States v. Ballard, 322 U.S. 78, 85-88, 64 S. Ct. 882, 885-87, 88 L.Ed. 1148 (1944). The Supreme Court has emphasized, however, that "while the `truth' of a belief is not open to question, there remains the significant question whether it is `truly held.' " Seeger, supra, 380 U.S. at 185, 85 S. Ct. at 863. Without some sort of required

15

> showing of sincerity on the part of the individual or
> organization seeking judicial protection of its beliefs,
> the first amendment would become "a limitless excuse
> for avoiding all unwanted legal obligations."

Id. at 1030 (internal footnotes omitted) (emphasis added).

We reiterated the same theme in the course of explaining
the necessity of a finding that Africa's sincerely held beliefs
were religious in nature:

> As was observed earlier, the judicial branch is neither
> authorized nor equipped to pronounce upon the veracity
> of a religious precept. Unless, however, every
> individual's subjective definition of a religion is to be
> controlling in first amendment litigation, "a court must,
> at least to a degree, examine the content of the
> supposed religion, not to determine its truth or falsity,
> or whether it is schismatic or orthodox, but to determine
> whether the subject matter it comprehends is
> consistent with the assertion that it is, or is not, a
> religion." Malnak, supra, 592 F.2d at 208 (concurring
> opinion).

Id. at 1034 n.18 (emphasis added).

While Africa was decided before Turner, there is nothing
in Turner, subsequent Supreme Court jurisprudence, or the
jurisprudence of our circuit that is inconsistent with the
holding in Africa. Even unorthodox beliefs are afforded
protection under the Free Exercise Clause of the First
Amendment, so long as they are sincerely held and
religious in nature. In the present case, the defendants
conceded that DeHart's beliefs are sincerely held and
religious in nature. It necessarily follows that DeHart's
beliefs were constitutionally protected. It also necessarily
follows that the District Court erred by according them less
weight because they were not shared or considered
essential by others in the Buddhist religion.6

_____

6. By so concluding, we do not mean to suggest that evidence of the
tenets of established religions is irrelevant in a context like this.
Quite
the contrary, such evidence may bear on the determination of whether
a person's beliefs are sincerely held and whether they are religious in
nature.

16

Having established that DeHart's beliefs are entitled to constitutional protection and that the prison is restricting his ability to practice his religion in accordance with those beliefs, the second prong of Turner requires us to examine whether DeHart has alternative means of exercising the circumscribed right. As this Court and others have noted, whether an alternative means of expression remains available depends on how the relevant First Amendment right is defined. See Waterman v. Farmer, 183 F.3d 208, 218 (3d Cir. 1999); Amatel v. Reno, 156 F.3d 192, 201 (D.C. Cir. 1998). For this reason, the Supreme Court has instructed that " `the right' in question must be viewed sensibly and expansively." Thornburgh v. Abbott, 490 U.S. 401, 417 (1989) (quoting Turner, 482 U.S. at 92). In Turner, the challenged prison regulation prohibited correspondence between an inmate and inmates at other institutions. The Court, in applying the second factor, did not inquire whether inmates had alternative means of communicating with inmates at other institutions. Rather, it concluded that because the regulation barred "communications only within a limited class of other people," it did not deprive prisoners of alternative means of expression. Turner, 482 U.S. at 92. Similarly, in Thornburgh, where the challenged regulation prevented inmates from receiving sexually explicit material that posed a threat to security, the Court found that alternative means of expression were available because the regulations permitted "a broad range of publications to be sent, received, and read." Thornburgh, 490 U.S. at 418.

The distinction in Johnson on which the District Court seized simply recognizes that courts must consider the nature of the right for which the inmate seeks accommodation -- i.e., whether, in the context of the inmate's belief system, it is a "religious commandment" or a "positive expression of belief" -- in order sensibly to define the relevant right. Thus, if failure to accommodate an inmate's request forces that inmate to do something that is proscribed by his or her religion, as he or she understands it, we must recognize that there are no alternative means by which he or she may engage in the relevant religious practice. See Johnson, 150 F.3d at 282 (in such cases "the importance of alternative means of religious observance is an irrelevant consideration"). The present

17

case provides a perfect example -- by denying DeHart's request for a vegetarian diet, the prison officials forced him to do something forbidden by his religious beliefs. There are simply no alternative means by which DeHart can maintain a diet in conformity with his religious beliefs; he is either provided a vegetarian diet, or he is not.

In contrast, where a prison regulation merely limits a form of positive expression of one's religious faith and beliefs -- as, for example, prayer, worship, meditation, scripture study, etc. -- the second Turner factor requires consideration of the alternative means of expression that are left open.7 If, as in O'Lone v. Shabazz, 482 U.S. 342 (1987), Muslim inmates are prohibited from attending Jumu'ah, a congregate service held only on Friday afternoons, do they have other opportunities for congregate worship at other times? To the extent alternative avenues of expression are open, Johnson dictates that the weight accorded the inmate's interest in the prohibited form of expression is entitled to less weight.

Following our reasoning in Johnson, we find that no alternative means of expression exist for DeHart, because by failing to provide him with a vegetarian diet, the prison officials have forced DeHart "to defile himself, according to [his own] conscience, by doing something that is completely forbidden by [his] religion." Johnson, 150 F.3d at 282 (quoting Ward v. Walsh, 1 F.3d 873, 878 (9th Cir. 1993)). As we stressed in Johnson, however, the absence of

_____

7. We, thus, agree with the dissent that "Johnson makes clear that the centrality of a religious practice . . . is a valid consideration in applying
the Turner test." The issue for decision here, however, is whether the Court in determining the "centrality" of a particular belief must look to the sincerely held religious beliefs of the inmate involved or to the "orthodox" beliefs of others. As we have explained, we read Smith and Africa together as requiring that courts not"pronounce on the veracity of a religious precept." Africa, 662 F.2d at 1034 n.18. Provided that the relevant precept is sincerely held and religious in nature, we must afford it constitutional protection. Thus, in this case, because the prison has conceded that DeHart's belief -- i.e., that his religion requires him to follow a specific diet -- is sincerely held and religious in nature, that belief is entitled to the full measure of constitution protection, whether or not it is shared by others in the Buddhist religion.

18

alternatives for DeHart does not necessarily mean that his interest in a vegetarian diet must be accommodated. Nevertheless, it does mean that that interest is entitled to substantially more weight in the "overall reasonableness" analysis than it would be if there were adequate substitute means of expression.

We recognize that our holding conflicts with the recent decision of the Sixth Circuit Court of Appeals in Spies v. Voinovich, 173 F.3d 398 (6th Cir. 1999). The facts in that case were similar to those here: a prisoner desired a strict vegan meal -- i.e., absolutely no food stuffs derived from animals -- in conformity with his Buddhist religious beliefs. In Spies, however, the prisoner conceded that, while a vegetarian diet was required by Buddhism, a vegan diet was not. The prison had provided the prisoner with a vegetarian diet, but it refused to provide a vegan diet. The prisoner brought suit, alleging infringement of his free exercise rights. The Sixth Circuit Court of Appeals held that, although Spies's vegan beliefs were sincerely held religious beliefs, because they were not required by Buddhism, the prison could continue to provide a vegetarian meal, thereby granting Spies an "alternative means" of exercising his religion. See id. at 407. We, respectfully, disagree with the Spies analysis.

Under the First Amendment, citizens are not limited to practicing an organized religion. Whether other Buddhists agree with DeHart's beliefs is simply not relevant to the Turner analysis. The analysis conducted by the District Court presupposes that a person is limited to practicing a religion according to a specific prescription and that only those customs, which others recognize as required, will be unassailable. Cf. United States v. Ballard, 322 U.S. 78, 87 (1944) ("[Man] was granted the right to worship as he pleased and to answer to no man for the verity of his religious views."). To us, that seems contrary to the very point of the First Amendment, which was designed to protect the free exercise of any religion, whether it be organized, accepted, or not. See Spies v. Voinovich, 173 F.3d 398, 409 (6th Cir. 1999) (Moore, J., dissenting) ("the First Amendment does not provide greater protection for centralized religions with established sets of mandatory

19

doctrines than it provides for less established or individual-based religions").

3. Remaining Factors and the Weighing Process

The first two Turner factors focus on the prison's decision -- to what extent is it justified by legitimate and neutral concerns and what options does it leave open to the inmate. The third and fourth factors, on the other hand, focus on the specific religious practice or expression in which the inmate wishes to engage -- what will be the consequences of accommodating the inmate for guards, other inmates, and the allocation of prison resources.

As we have previously noted, DeHart desires a meal, served along with the therapeutic meals, consisting of an eight-ounce cup of soy milk and increased portions of the non-meat and non-dairy items from the master menu. The soy milk supplement is the only item DeHart requests that is not currently purchased by the DOC. The District Court found that the prison could provide DeHart a cup of the soy milk at each meal for a total cost of $1.71 per day.

The District Court's analysis of the third Turner factor was as follows:

> The third factor in the Turner test is the impact which providing plaintiff a strict vegetarian diet would have on the institution, guards and other inmates. There is no undisputed evidence concerning the impact this factor has, and it is neutral for purposes of the motion for summary judgment.

District Court Slip Op. at 17. With respect to the fourth factor, the District Court concluded that "the cost factor favors the prison, while the fact that an available alternative exists favors plaintiff 's position. This factor is also neutral." District Court Slip Op. at 18.

The District Court ultimately granted summary judgment against DeHart on the following ground:

> Considering the evidence in the light most favorable to plaintiff, two of the four Turner factors weigh in favor of defendants, while the final two factors are neutral. Thus, the court concludes that application of the

20

> Turner balancing test results in the conclusion that the
> First Amendment does not require Prison Officials to
> provide plaintiff a vegetarian diet.

District Court Slip Op. at 18.

The District Court's analysis of the third factor is unacceptable. It is true that there is "no undisputed evidence" regarding the impact that accommodating DeHart would have on the prison community. DeHart's evidence regarding the service of therapeutic and kosher meals and what it would take to meet his religious requirements would support an inference that any impact would be minimal. On the other hand, the defendants have tendered evidence tending to show that, if DeHart is accommodated, others will demand similar treatment. But the fact that there is no undisputed evidence is not a reason for concluding that the third factor is neutral. If there is conflicting evidence, the conflict needs to be resolved and findings made about the size and quality of the impact on the prison community. Without such findings, it is not possible for the District Court to engage in the sensitive weighing process that Turner envisions.

This brings us to a final fundamental problem with the District Court's analysis. Turner does not call for placing each factor in one of two columns and tallying a numerical result. The objective is to determine whether the regulation is reasonable given the defendants' penological concerns and the inmate's interest in engaging in the constitutionally protected activity. Turner thus contemplates a weighing process, and various factors necessarily will be entitled to different weights depending on the circumstances. We have already spoken about how the weight to be given to the second factor will vary depending on the availability of alternatives. The same is true of the first factor; direct threats to the security of the institution will justify infringements on First Amendment rights that speculative efficiency concerns will not. Accordingly, the Court, while giving due deference to the expertise of prison officials, must take into account the character of the legitimate penological interest advanced and the degree to which that interest will be served by the challenged regulation.

21

IV.

Finally, DeHart asserts an equal protection claim, arguing that he is similarly situated to the Jewish inmates in Johnson whose dietary restrictions were accommodated by the defendants. As with his First Amendment claim, DeHart's equal protection claim must be analyzed under the Turner framework. See Turner, 482 U.S. at 89 ("[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid it is reasonably related to legitimate penological interests."). Thus, in order to recover, DeHart "must prove that the distinction between himself and the other inmates was not reasonably related to some legitimate penological purpose." Clark v. Groose, 36 F.3d 770, 773 (8th Cir. 1994).

As we noted earlier, the District Court did not comment on the fact that the defendants are currently providing specially prepared kosher diets to Jewish inmates at greater cost. We have already rejected defendants' argument that DeHart may be treated differently because his diet is not required by Buddhism generally. Thus, as with the First Amendment claim, if DeHart can demonstrate that no legitimate penological purpose is served by treating him differently from the inmates in Johnson, he must prevail on his equal protection claim. Due to the absence offindings as to whether the prison's decision to treat DeHart differently from Jewish inmates is "reasonably related to legitimate penological interests," Turner, 482 U.S. at 89, however, we will remand this issue to the District Court.

V.

For the foregoing reasons, the judgment of the District Court will be reversed, and the case will be remanded for further proceedings consistent with this opinion.

22

SCIRICA, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that this case should be remanded for further factual assessment of the factors set forth in Turner v. Safley, 482 U.S. 78, 89 (1987). I also agree with the majority's admonition that those factors are to be balanced, not tallied. I write separately because I respectfully disagree with the majority's position as to whether an analysis of an inmate's "alternative means of religious expression" under Turner properly may include an assessment of the centrality of the religious tenet on which an inmate's requested accommodation is based.

Turner requires us to uphold a prison's regulation if it is reasonably related to a legitimate penological interest. Once a prison establishes a legitimate interest, the four Turner factors gauge the regulation's overall reasonableness. I agree that the defendants here established the necessary legitimate penological interest, and established that the prison's special diet regulation is rationally related to that interest (the first Turner factor). I disagree with the majority's analysis of the remaining Turner factors.

The second Turner factor assesses the existence of alternative means by which an inmate can practice his religion, not whether there are alternatives to the specific activity at issue.[1] O'Lone v. Shabazz, 482 U.S. 342, 351–52 (1987). Here, the District Court concluded that DeHart had many alternative ways to exercise his right -- meditation, prayer, or reading religious texts -- all of which the prison allowed. The District Court based its analysis of this factor on a determination that vegetarianism is not a "commandment" of Buddhism (even of the particular sect to which DeHart belongs), but is merely a positive expression of DeHart's faith. The majority rejects this analysis, stating that the court erred in making any assessment at all about the central tenet issue, because under Employment Div.,

_____

1. For this reason, I believe the majority's conclusion that "[t]here are simply no alternative means by which DeHart can maintain a diet in conformity with his religious beliefs" is based on too narrow a characterization of the "right" at issue.

23

Dep't of Human Resources v. Smith, 494 U.S. 872 (1990), such inquiry is forbidden.

I do not believe that Smith forbids inquiry into the central tenet issue when assessing Turner's second factor. Smith addressed whether a criminal law banning peyote use was unconstitutional where the use was religious. Holding that it was not, the Court rejected application of a"compelling interest" test, stating that it would be improper for judges to assess the centrality of religious beliefs in assessing whether to apply a compelling interest test. Id. at 886. The Court did not indicate that the centrality issue should never be considered, and did not address the centrality issue in the context of assessing a challenged prison regulation.2

_____

2. For the same reason, I do not believe that Africa v. Pennsylvania, 662 F.2d 1025 (3d Cir. 1981) concludes our inquiry here. The key issue there was whether Africa's purported religion ("MOVE") was in fact a religion. We held that it was not. As the majority acknowledges, Africa did not reach the issue that DeHart presents: whether the state's penological interests outweigh an inmate's free exercise claim. In this case, the parties do not dispute that DeHart's beliefs are religious in nature, or sincerely held. (Interestingly, the record shows that only after DeHart filed several grievances objecting to a diet that included vegetables cooked in butter did he raise the issue of his religious practices.) Nor are
the parties (or the court) attempting to assess the truth or falsity of DeHart's beliefs. Instead, as Turner requires, we assess the central tenet issue to determine whether DeHart has alternative ways to exercise his First Amendment rights. Similarly, in Africa we expressly acknowledged that a court must examine the content of an asserted religion (at least to a degree) in order to determine whether it is, in fact, a religion. Africa,
662 F.2d at 1034 n.18. In short, to interpret Africa to preclude any objective evidence on the centrality issue would eviscerate Turner's second prong. On this point, I note that in Johnson we analyzed the issue in terms of the requirements of the kosher laws, and not merely the inmates' subjective interpretations of those laws. Similarly, the court
in Ward v. Walsh, 1 F.3d 873, 878 (9th Cir. 1993) (a case we quoted in Johnson) stated that on remand the district court could consider the inmate's "challenge to the orthodoxy of the rabbi who testified on behalf of the state." Clearly, the inquiry does not end with the inmate's claims; the defendant is entitled to put on evidence of the centrality of the practice at issue, and the district court is entitled to weigh that evidence
against the inmate's testimony.

24

Turner, however, did address the issue of assessing a challenged prison regulation, noting expressly the deference to be accorded to prison officials' decisions, and the separation of powers concerns that counsel a policy of judicial restraint. Turner, 482 U.S. at 84-85. Turner requires courts to consider whether an inmate has alternative means of exercising his right to religious freedom. That question cannot be answered withoutfirst determining the centrality of the practice or belief at issue; that is, whether or not it is commanded by the inmate's religion. As we held in Johnson -- in the specific context of evaluating the second Turner factor --"the importance of alternative means of religious observance is an irrelevant consideration when the belief at issue is a `religious commandment' rather than a positive expression of belief." Johnson, 150 F.3d at 282. The Jewish inmates in Johnson would have been " `defiling' themselves under the laws of kosher when forced to eat non-kosher foods . . . In such situations, the centrality of the religious tenet carries greater weight and the existence of alternative means of observance is of no use in the ultimate balance which Turner commands." Id. at 282.

It seems to me that our holding in Johnson makes clear that the centrality of a religious practice -- in particular, whether it is a commandment of the religion or a positive expression of belief -- is a valid consideration in applying the Turner test. If the practice is a commandment (as is keeping kosher for certain Jewish inmates), then alternative means of expression are irrelevant, and the second Turner factor will weigh in an inmate's favor. But if the practice is a positive expression of belief and the inmate has alternative means of expression, then the factor may weigh in the defendant's favor, depending on the facts.

Here, the evidence established that vegetarianism (or, by extension, the more restrictive veganism that DeHart wishes to practice) is not a commandment of either Buddhism in general or of the particular branch of Buddhism that DeHart practices. This is shown by the testimony of the defendants' expert witness, and by the written correspondence between DeHart and his spiritual mentors, members of The City of Ten Thousand Buddhas.

25

In response to DeHart's query about vegetarianism, The City of Ten Thousand Buddhas advised him that although vegetarianism is preferred, it was not mandated in his situation: "Clearly you are not in an ideal situation for doing so. The Buddha, in giving us the Precepts, consistently provided minor acceptions [sic] in cases where it would be impossible to hold them to the finest detail . . . [I]t would seem enough that you are sincere in your wish to maintain the Buddha's precepts and that you try your very best to follow the Buddha's instructions as closely as possible, while practicing patience with our states and with your environment." Thus, even the particular Buddhist temple to which DeHart belongs does not believe that DeHart's vegetarianism is a required practice, and does not view his failure to keep the diet as a defiling offense. For this reason, the situation of the Jewish inmates in Johnson properly is distinguished from that of DeHart. In this regard, I respectfully disagree with the majority's contrary position (and instructions regarding entry of judgment on remand).[3]

As to the third and fourth Turner factors-- the impact on the prison of accommodating DeHart's request for special meals, and whether there are easy alternatives by which

_____

3. The majority instructs the District Court to enter judgment for DeHart unless it can distinguish this case from Johnson on grounds other than the central tenet issue. The majority's instruction is based on its interpretation of Turner's requirement that in order for a regulation to be
rationally related to a legitimate penological interest, the regulation must
be neutral. Turner, 482 U.S. at 89-90. I do not believe Turner's neutrality
requirement supports the majority's directive, for it asks whether the challenged regulation operates in a neutral way, without regard to the content of expression. Id. at 90. Moreover, we have previously explained that Turner's neutrality requirement is met if the prison's asserted interest giving rise to the regulation is unrelated to suppressing expression. See Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999) (quoting Thornburgh v. Abbott, 490 U.S. 401, 415 (1989)). We held in Waterman that New Jersey's interest in rehabilitating sex offenders was not related to the suppression of expression, and the challenged regulation therefore was neutral. Id. So, too, the prison's interest here in
an efficient food service system is not related to the suppression of religious expression. Accordingly, its special diet regulation is neutral for
purposes of the Turner analysis.

DeHart can be accommodated at de minimus cost -- I agree that further fact-finding is necessary. But unlike the majority, I believe that on remand the court first must clarify the nature of DeHart's requested accommodation. DeHart frames the issue as a request for a vegetarian diet. Vegetarian diets typically avoid meat, fish, and poultry. DeHart's proposed diet is more restrictive. Not only must it be free of meat, fish, and poultry, but also free of eggs, dairy products, pungent root materials such as onions or garlic, and any material derived from any animal product. In this respect, DeHart's requested diet[4] is even more restrictive than a vegan diet (one disallowing all animal products) because it also would prohibit any non-animal food or material that is prepared with animal products (for example, vitamin supplements that may include bone derivatives or bread made with animal byproduct preservatives, both of which DeHart has declined). On this point, it bears noting that the Court of Appeals for the Sixth Circuit in Spies v. Voinovich, 173 F.3d 398 (6th Cir. 1999) (which the majority distinguishes) held that a prison was not constitutionally required to provide a Buddhist inmate with a vegan diet. In sum, a clear understanding of the precise nature and parameters of the special diet that DeHart seeks (for example, whether the diet prohibit fruits and vegetables that have been fertilized with organic material) is essential to a proper assessment of the

_____

4. The majority apparently believes that DeHart can be accommodated with extra portions of vegetables and bread, and with a cup of specially-purchased soy milk with each meal. But, as noted supra, the record contains conflicting evidence as to the precise nature of the diet that DeHart seeks (including a "beans and rice" diet that DeHart suggested at the preliminary injunction hearing). Moreover, DeHart has not rebutted the testimony of the defendants' expert that the "extra portions plus soy milk" diet fails to meet the relevant regulatory nutritional requirements for inmates, is based on an out-of-date master prison menu (and is therefore not accurate with respect to food items that the prison has available), and cannot fully be evaluated because it proposes only a five-day menu, compared to the prison's forty-two day menu cycle. Unless DeHart addresses these issues on remand, his proposed diet does not appear to be a viable one.

27

resulting burden on the prison in complying with his request, and the overall balancing of the Turner factors.5

In assessing the burden on the prison of accommodating DeHart's request, I believe the majority fails to take sufficient account of the evidence of the potential for "ripple effect" within the prison. The Supreme Court has encouraged courts to give "particular deference" to the informed discretion of corrections officials on this issue. Turner, 482 U.S. at 90.

Finally, with respect to DeHart's equal protection claim that he is being treated differently from Jewish inmates who request and receive kosher meals, I do not believe that DeHart has stated a valid claim. In order to do so, he must come forward with some evidence of discriminatory intent on the part of the defendants. DeHart has not done so. Accordingly, I would affirm the grant of summary judgment on this issue.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit
_____

5. The majority's point as to the need for a bona fide balancing of the factors is well-taken. But we have noted that in the course of conducting that balancing, the first Turner factor "looms especially large." Waterman,
183 F.3d at 208.

28