Jason McKinley WARD, Petitioner–Appellant,

v.

Jessie WALSH, Associate Warden of Programs, Respondent–Appellee.

No. 91–15427.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 6, 1992 *.

Decided July 30, 1993.

---

* The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a), Ninth Circuit R. 34–4.

Jason McKinley Ward, in pro. per.

Marc P. Cardinalli, Deputy Atty. Gen., Carson City, NV, for respondent-appellee.

Before: CHOY, NOONAN, and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

Jason McKinley Ward is the only Orthodox Jewish prisoner at Ely State Prison in Ely, Nevada. He brought suit under 42 U.S.C. § 1983, arguing that the prison infringes upon his First Amendment right to exercise freely his religion by not providing him with a kosher diet, clothes made of a single fabric, or an Orthodox rabbi; by not allowing him to have candles in his cell; and by refusing to guarantee that he will not be transported on the Sabbath. He seeks injunctive relief only, and appeals pro se from the district court's judgment in favor of the warden after a bench trial.

I

Religion is the first of our rights under the First Amendment and the Bill of Rights. The right to the free exercise of religion is a precious American invention, distinguishing our Constitution from all prior national constitutions. The right to the free exercise of religion is to be jealously guarded. It is the right of a human being to respond to what that person's conscience says is the dictate of God. It is not a right to be readily trammeled by the state. A human being does not cease to be human because the human being is a prisoner of the state. "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987), provides the test for balancing those interests: "When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."

Turner set forth four factors to be considered in determining when a regulation is reasonably related to legitimate penological interests. First, there must be a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Id. at 89, 107 S.Ct. at 2262. Second, whether there are "alternative means of exercising the right that remain open to prison inmates" must be assessed. Id. Third, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" must be determined. Id. Fourth, "the absence of ready alternatives" to the regulation must be explored. The "existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." Id.

The warden argues that free exercise claims of prisoners are no longer governed by Turner, but instead must be evaluated under the standard announced in Employment Division, Department of Human Resources v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Smith held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " Id. at 879, 110 S.Ct. at 1600 (citation omitted). In reaching that conclusion, the Court noted that it had "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." Id. at 878–79, 110 S.Ct. at 1600.

We see no reason to depart from *Turner*. The Supreme Court has held that *Turner* applies to all constitutional claims arising in prison with the exception of Eighth Amendment claims. *See Washington v. Harper*, 494 U.S. 210, 223, 110 S.Ct. 1028, 1037, 108 L.Ed.2d 178 (1990); *see also Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir.1993) (en banc). Moreover, the *Smith* case concerned a factual situation far different from the one presented here. Inmates must rely on the prison system to provide them with the necessities of life. Determining to what extent prison officials must accommodate a prisoner's right to free exercise in fulfilling this obligation is wholly different from determining whether free citizens must obey criminal laws of general applicability.

## II

Ward argues that the prison is obliged to provide him with a strict kosher diet at the prison's expense "that is certified or deemed religiously acceptable by an outside independent Orthodox Jewish Organization ... at the time the food is physically served to Orthodox Jewish inmates." The diet requested by Ward would require the prison not only to provide kosher food, but to store and to prepare the food in a special manner. Moreover, Ward requests that the food be served in an "eating area [that is] kept kosher for all Jewish inmates."

We have held that "[i]nmates ... have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of their religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir.1987). However, we have never determined precisely how this right is to be balanced against budgetary and administrative concerns of the prison.[1]

█ The warden provides a pork-free diet to inmates who request it, but does not provide a full kosher diet. Whether the culinary policy is reasonable requires a balancing of the degree of intrusiveness into the right of free exercise against the costs of accommodation, giving appropriate deference to prison officials' assessment of the costs. The *Turner* factors help focus this determination. The first *Turner* factor requires us to consider whether there is a logical connection between the policy and the legitimate governmental interest that justifies it. The prison has a legitimate interest in running a simplified food service, rather than one that gives rise to many administrative difficulties. *Kahey*, 836 F.2d at 950. Since the policy of not providing special diets is related to simplified food service, the first factor weighs in favor of the government.

█ The second *Turner* factor requires us to consider whether Ward has alternative means by which he can practice his religion. The relevant inquiry under this factor is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, we are to determine whether the inmates have been denied all means of religious expression. *O'Lone*, 482 U.S. at 351–52, 107 S.Ct. at 2406. In other cases, courts have found that although some aspects of religious practice were impinged upon, claimants retained the ability to participate in other significant rituals and ceremonies of their faith. For example, although the Muslim claimants in *O'Lone* were denied the opportunity to attend Jumu'ah, the Muslim weekly religious service, they had the virtually unlimited right to congregate for prayer and discussion outside of working hours. Moreover, the Muslim prisoners had free access to an imam, a Muslim prayer leader, whom the state provided. Muslim prisoners were given special meals, and special arrangements were made during the month-long observation of Ramadan, a period of

---

1. Courts that have considered the question have reached varying results. *Compare, e.g., Kahane v. Carlson*, 527 F.2d 492 (2d Cir.1975) (pre-*Turner* case holding that the Orthodox Jewish inmates are entitled to a kosher diet; difficulties in providing diet are surmountable) *and Whitney v. Brown*, 882 F.2d 1068 (6th Cir.1989) (prison policy which eliminated Jewish inmates' right to participate in annual Passover seder was an im-

permissible infringement upon the inmates' free exercise rights) *with Kahey v. Jones*, 836 F.2d 948, 950–51 (5th Cir.1988) (prison not required to provide full kosher diet where doing so would be administratively unfeasible) *and Martinelli v. Dugger*, 817 F.2d 1499, 1507 n. 29 (11th Cir. 1987), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988) (same).

fasting and prayer, to allow them to take their meals at the religiously prescribed times. *Id.*

■ In contrast, Ward's ability to participate in religious observances has been significantly circumscribed within the prison. Because of the remoteness of the area, he does not have access to an Orthodox rabbi. Since he is the only Orthodox Jewish prisoner in the institution, he does not have access to religious services. Moreover, he cannot congregate with other practitioners of his faith for prayer and discussion. It is true that Ward is encouraged to practice other observances of his faith privately. The district court heard testimony from an Orthodox Jewish rabbi that private prayer is a significant aspect of the practice of the Jewish religion. However, we cannot conclude that the opportunity to engage in private prayer is enough to satisfy the second *Turner* factor as interpreted by *O'Lone*. If it were, the factor would have no meaning at all because an inmate would always be able to pray privately. *See Sample v. Borg*, 675 F.Supp. 574, 580 (E.D.Cal.1987), *vacated as moot*, 870 F.2d 563 (9th Cir.1989). In short, because Ward's religious practice has been so dramatically curtailed in prison, the second *Turner* factor weighs in his favor. *Cf. Kahey*, 836 F.2d at 950–51 (second factor weighed in prison's favor because there was no indication that Kahey had been deprived of the ability to practice her religion in any other way).

■ Also relevant to the evaluation of the second factor is a distinction *O'Lone* had no occasion to make: the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul. It is one thing to curtail various ways of expressing belief, for which alternative ways of expressing belief may be found. It is another thing to require a believer to defile himself, according to the believer's conscience, by doing something that is completely forbidden by the believer's religion. In order to determine what alternatives are open to Ward, findings must be made as to what is or is not forbidden by his religion.

The district court made no such findings; we must remand so that the court can do so.

■ In making these findings, it will be appropriate for the district court to consider Ward's challenge to the orthodoxy of the rabbi who testified on behalf of the state. In religious matters, we take judicial notice of the fact that often the keenest disputes and the most lively intolerance exists among persons of the same general religious belief, who, however, are in disagreement as to what that faith requires in particular matters. *See Thomas v. Review Bd.*, 450 U.S. 707, 715–16, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981). In this case, Ward is entitled to argue, with appropriate authorities, that his religious belief is different from the interpretation provided by the witness for the state.

■ The third *Turner* factor requires us to consider the "impact accommodation ... will have on guards and other inmates, and on the allocation of prison resources generally." *Washington v. Harper*, 494 U.S. 210, 225, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990). Although the district court made no findings regarding this factor, we accept the warden's contention that if other prisoners are not similarly accommodated, they might well perceive Ward as being favored. *Kahey*, 836 F.2d at 951. "This perception [could] have an adverse impact on prison morale," *id.*, causing disruption throughout the prison. This effect, however, is present in every case that requires special accommodations for adherents to particular religious practices. While not irrelevant, it is not in itself dispositive.

More important are the administrative difficulties that could potentially arise in accommodating Ward's request. Common sense tells us that there would be some disruption to the efficient operation of culinary services if the prison were required to provide a special meal for one prisoner. The district court, however, made no findings regarding how great the disruption would be. Indeed, the district court made no findings regarding whether the prison had explored the possibility of accommodating Ward. Although we must give deference to the prison official's own assessment of the burden on prison operations, we cannot simply accept the war-

den's assertion on appeal that the disruption would be significant. Likewise, the district court made no findings regarding the financial impact of accommodation. Again, it is clear that providing a kosher diet would give rise to some expense, not only from the cost of Ward's meals but also from the cost of accommodating others with similar claims of entitlement to a religious diet. We cannot determine how heavily this factor weighs in the prison's favor, however, because the magnitude of these costs is a factual question for which the district court made no findings.

Finally, under the fourth factor, we must consider whether there are ready alternatives to the prison's current policy that would accommodate Ward at de minimis cost to the prison. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation," *Harper*, 494 U.S. at 225, 110 S.Ct. at 1038, while the existence of alternatives may be "evidence that the [policy] is not reasonable but is an 'exaggerated response' to prison concerns," *Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262. Here, the prison policy is to limit the accommodation of religious dietary laws to the provision of pork-free diets. On the record before us, we simply are unable to determine whether reasonable alternatives to this policy exist. Complying with every precept of the Kashruth, the Jewish dietary law, may involve significant expense; however, it may be possible to comply with the laws in substantial part at de minimis cost. For example, it may be possible to provide Ward with non-defiled foodstuffs, even if the dining area is not kept kosher. The district court, however, made no findings regarding the feasibility of such alternatives; we cannot speculate about their existence or the impact they would have on culinary services.

 In the absence of sufficient factual findings regarding the second, third, and fourth factors, it is impossible for us to determine whether the denial of a kosher diet is reasonably related to the prison's legitimate interest in streamlined food service. In *McElyea* we established the principle that inmates have the right to be provided with food that satisfies the dietary laws of their religion. *McElyea*, 833 F.2d at 198. Abro-

gation of this important right cannot be justified by the rote recitation of the *O'Lone* standard. The failure to provide a kosher diet may require Ward to defile himself in a manner not contemplated by *O'Lone*. Moreover, unlike the claimants in *O'Lone*, Ward's religious practice in general has been significantly curtailed by the fact of incarceration in the remote prison. In such circumstances, it is necessary to evaluate carefully the justifications proffered by the prison before determining whether the Constitution allows the intrusion into the free exercise right of the inmate. We remand this claim so that the district court can make specific factual findings and can engage in a careful balancing of all the *Turner* factors.

## III

 Ward argues that he must be allowed to have candles in his cell to observe certain rituals of his religion. The warden asserts that candles pose a significant fire hazard, and thus under no circumstances are prisoners allowed to have them in their cells. The *Turner* factors clearly weigh in favor of the prison officials on this claim. The serious safety and security concerns raised by allowing inmates to possess and use candles outweigh the curtailment of Ward's religious practice. Thus, we conclude that the regulation is reasonably related to a legitimate penological purpose and thus is valid under *Turner*.

## IV

 Ward argues that the warden violated his First Amendment rights when it transferred him to Ely on the Sabbath. He asks for an injunction to prevent the prison from transporting him on any Sabbath or Jewish holiday, comprising eighty-eight days in the year.

Again the application of the *Turner* factors leads to the conclusion that the prison's policy is reasonably related to a legitimate governmental interest. First, the prison has a legitimate penological interest in having a standardized, efficient transportation system. Prisoners are transported for medical, security, and other reasons. According to the

warden, the health, safety, and welfare of the prisoners is dependent upon the ability to move prisoners quickly and efficiently when necessary. The prison policy of not guaranteeing that inmates will be transported only on certain days is logically connected to the legitimate government interest in security and efficient transportation.

Second, Ward does not contend that the prison intends to transfer him on *every* Sabbath. Because he can observe most Sabbaths, we conclude that he has alternative means of exercising his religion as contemplated by *O'Lone*.

Third, a hard and fast rule that Ward and other Jewish prisoners could never be transported on the Sabbath or holidays could have a significant impact on guards, other inmates, and prison resources. Such a policy could disrupt the efficient administration of the transportation system at the prison.

Fourth, Ward does not offer any alternatives that could fully accommodate his rights at de minimis costs to valid penological interest. The prison's current transportation policy is to accommodate the religious beliefs of the inmates when at all possible. Given this policy, we conclude that Ward is not entitled to the injunction he seeks.

## V

■ Ward has requested that the prison provide him with an Orthodox rabbi. Since Ward is the only Orthodox Jewish prisoner in the institution, the prison does not have a rabbi on staff. It is not clear whether the prison made any effort to contact an Orthodox rabbi on Ward's behalf; however, a prison official testified that there were no Orthodox Jewish rabbis within a one hundred mile radius of the prison. No rabbi has volunteered to come to the prison. The prison, however, in no way restricts Ward's ability to contact a rabbi on his own to come into the prison, nor does it forbid rabbis from coming into the prison. Thus, the issue here is whether the prison has an affirmative obligation to provide a rabbi for Ward.

We have previously held that prison officials have no such obligation. In *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir.1987), we concluded that a "prison administration is not under an affirmative duty to provide each inmate with the spiritual counselor of his choice." *Accord Cruz v. Beto*, 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972) (dicta). Thus, the prison has not infringed upon Ward's right to free exercise by not providing a rabbi.

■ Ward argues that he would have access to a rabbi if he were moved to a different prison. However, the prison officials point out that Ward is a maximum security prisoner, and that Ely is the only maximum security prison in the Nevada prison system. We cannot conclude that Ward's placement at Ely is not reasonably related to a legitimate penological purpose, and therefore we must affirm the district court on this issue.

## VI

■ Ward argues that the prison has an affirmative obligation to provide him with clothing that is made with only one fiber. The prison has refused to do so, but has informed Ward that he may provide his own clothing as long as it conforms to the prison dress code. All prisoners are required to wear solid blue denim clothing.

Ward does not question the necessity of the prison's policy requiring prisoners to dress uniformly. Rather, his argument focuses on whether the prison has an affirmative obligation to provide him with clothing that conforms to the dictates of his religion. We conclude that under the *Turner* standard, the prison does not have such an obligation. The third and fourth factors of *Turner* are determinative. Allowing one prisoner to receive preferential treatment with regard to clothing could potentially cause conflicts among inmates and providing each prisoner with the clothing or other implements necessary to the practice of their religion would impose a cost that would be more than de minimis. We conclude that the prison's policy of allowing Ward to buy and to wear his own clothing satisfies the *Turner* standard.

## VII

Ward seeks an injunction ordering the prison to allow Jewish inmates to wear religious jewelry, yarmulkes, and talliths (prayer shawls). It appears, however, that inmates are already allowed to possess and to wear these items under existing prison policy. Since Ward can show no injury that can be redressed by the injunction he seeks, he has no standing to bring this claim. *See, e.g., Valley Forge Christian College v. Americans United for a Separation of Church & State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

## VIII

In a letter of April 26, 1993, addressed to this court, Ward has raised a question of retaliation for bringing this suit. We are in no position to adjudicate this contention, but if Ward's claims are true, there would have been serious interference with the jurisdiction of this court. On remand, we assume that the district court will have the opportunity to examine these contentions, which relate to Ward's access to this court on appeal.

Each party to bear its own costs.

**AFFIRMED** in part, **REVERSED** in part and **REMANDED.**