Edward Louis DEAN, Plaintiff,

v.

**CORRECTIONS CORPORATION OF AMERICA, et al., Defendants.**

**No. CV–13–00364–PHX–NVW**

United States District Court,
D. Arizona.

Signed February 20, 2014

David J. Don, Law Offices of David J. Don PLLC, Phoenix, AZ, Jack F. Schweigert, Law Office of Jack Schweigert, Honolulu, HI, for Plaintiff.

Ashlee B. Fletcher, Rachel Love, Struck Wieneke & Love PLC, Chandler, AZ, for Defendants.

## ORDER

Neil V. Wake, United States District Judge

Plaintiff Edward Louis Dean is a Hawaiian inmate assigned to Saguaro Correctional Center (SCC) pursuant to a contract between Corrections Corporation of America (CCA) and the State of Hawaii. Plaintiff, who is represented by counsel, filed a civil rights Complaint under 42 U.S.C. § 1983 in the District Court for the District of Hawaii and subsequently filed a First Amended Complaint. (Doc. 10.) On January 23, 2013, the Hawaii District Court granted Defendants' motion for a change of venue, and the action was transferred to the Arizona District Court. (Docs. 19, 48.)

The remaining Defendants—CCA, SCC Warden Todd Thomas, and the State of Hawaii Department of Public Safety Director Ted Sakai—move for summary judgment. (Doc. 85.) Plaintiff opposes the motion. (Doc. 89.)

The Court will grant the motion and terminate the action.

## I. Background

In his First Amended Complaint and attachments, Plaintiff alleges that he was transferred from Hawaii prisons to SCC on November 30, 2011. (Doc. 10.) He is an adherent of the Essene faith and requested a diet of raw fruits and vegetables, nuts, and unpasteurized cheese. Defendants have denied his requested diet and have, instead, offered him one of three other religious diets: kosher, which includes meat and cooked items; vegetarian, which includes cooked items; and vegan, which includes cooked items. Plaintiff contends that he is and has been forced to choose between not eating or violating sacred dietetic laws and tenets of his faith. (*Id.*)

On screening pursuant to 28 U.S.C § 1915A, the Court dismissed the Doe Defendants and Plaintiff's Eighth Amendment claim and held that the First Amended Complaint states a claim for violation of Plaintiff's rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc–1(a), and the First Amendment. (Doc. 54.)

In their Motion for Summary Judgment, Defendants argue that (1) Plaintiff cannot establish a substantial burden on his religious rights, (2) SCC has a compelling interest in denying the requested diet, (3) the denial is reasonably related to legitimate penological interests, (4) State of Hawaii officials sued in their official capacities are not subject to damages and there is no evidence of a policy of the State of Hawaii that caused a constitutional violation, (5) there is no evidence of involvement by Sakai and he is not a necessary party for injunctive relief, and (6) Plaintiff cannot establish a CCA policy for purposes of CCA liability. (Doc. 85.)

In support of their motion, Defendants submit their Statement of Facts (Doc. 86, (DSOF)), Sakai's declaration (*id.*, Ex. A); excerpts from Plaintiff's deposition (*id.*, Ex. C, Pl.'s Dep. Aug. 2, 2013); and the affidavits of Thomas (*id.*, Ex. B), Laurie LeClair, Trinity Regional Dietician (*id.*, Ex. D), and Susan Huffmann, Trinity Regional Vice President (*id.*, Ex. E). In opposition, Plaintiff submits his Memorandum (Doc. 89), his Statement of Facts (Doc. 90 (PSOF)), his affidavit (*id.*, Ex. 1, Pl.'s Aff.), discovery responses (*id.*, Ex. 3), and other exhibits.

## II. Legal Standards

### A. RLUIPA

■ Under RLUIPA, a government may not impose a substantial burden on

the religious exercise of a confined person unless the government establishes that the burden furthers a "compelling governmental interest" and does so by "the least restrictive means." 42 U.S.C. § 2000cc–1(a)(1)–(2). Under its own terms, RLUIPA must be "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir.2005) (citing 42 U.S.C. § 2000cc–3(g)). RLUIPA applies to private prisons.[1] *See Knows His Gun v. Montana*, 866 F.Supp.2d 1235, 1245 (D.Mont. Feb. 29 2012); *Dean v. CCA*, No. (N.D.Miss. Mar. 28, 2008).

█ The inmate bears the burden of establishing prima facie that RLUIPA has been violated and that his religious exercise has been substantially burdened. *Warsoldier*, 418 F.3d at 994 (citing 42 U.S.C. § 2000cc–2(b)). The government then bears the burden of proving that the substantial burden on the inmate's religious practice both furthers a compelling governmental interest and is the least restrictive means of doing so. *Id.* at 995 (citing 42 U.S.C. §§ 2000cc–1(a), 2000cc–2(b)).

### B. First Amendment

█ "Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'" *Shakur v. Schriro*, 514 F.3d 878, 883–84 (9th Cir. 2008) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir.1994); *see Shakur*, 514 F.3d 884–85 (noting the Supreme Court's disapproval of the "centrality" test and finding that

the "sincerity" test in *Malik* determines whether the Free Exercise Clause applies). If the inmate makes his initial showing of a sincerely held religious belief, he must establish that prison officials substantially burden the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith. *Shakur*, 514 F.3d at 884–85.

█ A regulation or policy that burdens the First Amendment right to free exercise may be upheld only if it is reasonably related to a legitimate penological interest. *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). This determination requires analysis of four factors: (1) there must be a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to inmates; (3) the impact that accommodation of the right will have on guards, other inmates, and the allocation of prison resources; and (4) the absence of ready alternatives. *Id.* at 90, 107 S.Ct. 2254.

### III. Background Facts

The following facts are undisputed except as specifically indicated:

Defendants assert that SCC's food services are provided by a contractor, Trinity Services Group (Trinity); Trinity provides food services personnel who work on site to conduct and supervise food services and works with its own vendors to obtain food supplies. (DSOF ¶ 7.) Meal plans are created by Trinity dieticians in accordance with contract requirements regarding rotation of menus and daily caloric requirements. (*Id.* ¶ 8.) Food supply deliveries are received by SCC three times a week;

---

1. Although the Ninth Circuit Court of Appeals has not addressed this question, Defendants do not argue that they are not subject to RLUIPA.

these involve security inspections of the delivery vehicles and the food deliveries in order to prevent the introduction of contraband into the facility, the transfer of contraband out of the facility, and escape and hostage taking. (*Id.* ¶ 9.)

The SCC menus are developed by a registered dietician employed by Trinity to provide a nutritionally adequate diet for prisoners and are based on an approximate daily average calorie count of 3,200 calories. (*Id.* ¶ 10.) The menus satisfy the Dietary Reference Intake/EARS recommendations published by the National Academy of Sciences–National Research Council for major nutrients recommended for adults and American Correctional Association (ACA) standards for basic nutritional requirements. (*Id.* ¶¶ 11–12.) Plaintiff objects to this as undisclosed expert testimony. (PSOF ¶¶ 11, 12.)

SCC provides various diets to meet medical and religious needs: a general mainline non-pork menu, a Kosher menu, a vegan and/or vegetarian menu, and medical diets (e.g. low sodium, diabetic, non-allergy). (DSOF ¶ 13.) Plaintiff states that the mainline, non-pork diet, in fact, contains pork. (PSOF ¶ 13.) SCC also operates a commissary where inmates can purchase food items with their inmate funds to supplement their diet. (DSOF ¶ 14.) Plaintiff alleges that he cannot supplement his diet with foods from the commissary because the available food items are not raw. (PSOF ¶¶ 14, 180.) The average daily population of SCC ranges between 1,600 and 1,900 inmates with more than 300 personnel. (DSOF ¶ 15.) Trinity cooks and serves three meals a day to the entire inmate population, as well as to SCC personnel. (*Id.* ¶ 16.) Thus, Trinity cooks and serves between 4,800 and 6,000 meals per day. (*Id.*) Segregation

inmates are fed in their cells, requiring 160–190 inmate meals to be transported from the kitchen to the segregation unit by hot carts, three times a day (480570 meals per day). (*Id.* ¶ 17.)

Defendants submit evidence that the cost of the providing Plaintiff the meals outlined under the sample menu he provided would be between approximately $473.61 and $523.18 per week or $24,627.85 and $27,205.50 per year, based on the cost of food and staff time to procure it.[2] (*Id.* ¶¶ 119, 130.) Plaintiff objects to all of Defendants' cost evidence as undisclosed expert testimony. (Doc. 89 at 12.)

As to the cost of purchasing the food needed to provide Plaintiff with the meals outlined under the sample menu, Trinity's Regional Vice President Huffman estimates that it is approximately $22.50 per day or $8,212.50 per year, as compared to SCC's vegetarian diet at approximately $2.48 per day or $905.20 per year, the vegan diet at $2.54 per meal or $927.10 per year, and the Kosher diet at $3.36 per day or $1,226.40 per year. (*Id.* ¶¶ 119, 120, 121.) According to her statement, Trinity priced the cost of purchasing the food items listed on the sample menu that are available from Trinity's existing food suppliers and vendors and the cost of purchasing the items listed on the sample menu that are available only from other suppliers and vendors; she notes that Trinity will not purchase the items for Plaintiff's diet in bulk quantities. (*Id.* ¶¶ 118, 124.) Food purchased at a retail supermarket is generally around 5–30 % more expensive than food purchased from a commercial vendor. (*Id.* ¶ 132.) She also notes that the vendors and suppliers outside of Trinity's existing network have not been vetted for food safety and quality so purchasing

---

**2.** The sample menu of raw vegetarian foods is at DSOF, Ex. B, Attach. A. (*See also* DSOF, Ex. C, Pl. Dep. 59:18–61:11.)

items from them could increase the risk of exposing Plaintiff, and the prison population as a whole, to dangerous bacteria known for causing food borne illnesses. (*Id.* ¶ 123.)

Huffman also avers that labor costs associated with procuring the items on Plaintiff's diet would be approximately $247.88 to $297.45 per week or approximately $12,889.76 to $15,467.40 per year (calculated by using a base salary of $26.44 per hour for the Food Service Director's salary, plus 25% for employee benefits, for 7½ to 9 hours per week, 52 weeks per year). (*Id.* ¶ 130.) She states that because Trinity will not purchase bulk quantities to prepare the sample menu meals for Plaintiff, the vendors outside its existing network will not make deliveries to SCC given its remote location or participate in the security screening process required to approve them for making deliveries to a prison. (*Id.* ¶ 124.) Therefore, as to items that it cannot purchase from its existing vendors and suppliers, Trinity's only option is to purchase these items from a retail supermarket, and the closest retail supermarket to SCC is in Casa Grande, Arizona, approximately 20 miles away. (*Id.* ¶¶ 125–126.) None of the supermarkets in Casa Grande will make deliveries to SCC, so Trinity's Food Service Director at the SCC would need to make an approximately 40–mile round trip at least three times per week to personally shop for and purchase the items. (*Id.* ¶ 127–128.) Trinity's Food Service Director would spend approximately 2½ to 3 hours each trip to walk across the prison grounds from the SCC kitchen to the prison exit, drive to the supermarket, shop for and purchase the items, drive back to the SCC, participate in security screening and inspection of the items purchased, walk back across the SCC grounds to the kitchen, store the items, prepare an inventory report to account for the items purchased and prepare an expense report to ensure proper billing to CCA because the items would need to be purchased on Trinity's credit card. (*Id.* ¶ 129.) In addition, the cost of gasoline and wear and tear on the Food Service Director's vehicle for a 40–mile round trip 3 times each week would be approximately $67.80 per week or $3,525.60 per year (based on a reimbursement cost basis of $0.565/mile for three trips per week, 52 weeks per year). (*Id.* ¶ 131.)

Regarding additional operational and security burdens, Huffman attests that Trinity's staff in the SCC kitchen helps CCA maintain appropriate custody, control and supervision over the inmates working in the kitchen and that the items listed on the sample menu are considered specialty foods, which will require the use of additional security measures to prevent inmates from smuggling the items out of the kitchen or otherwise converting the items into contraband. (*Id.* ¶ 135, 139.) If Trinity's Food Service Director is required to leave the SCC to purchase food items for the sample menu meals, this will create a gap in kitchen supervision and decrease staffing levels in the kitchen, which will increase meal production time and disrupt coverage during mandatory staff breaks. (*Id.* ¶¶ 140–141.) To offset these consequences, Trinity will either need to shuffle its staffing schedule to ensure that an appropriate number of personnel are on site at all times, which inconveniences Trinity's employees, or require its Food Service Director to shop for and purchase the items needed for the sample menu meals outside of normal business hours, which is inconvenient for him and will increase Trinity's labor costs to comply with its overtime compensation obligations. (*Id.* ¶ 142.)

Plaintiff submits no evidence of costs, but, as noted, he objects to all of Huffman's statement, asserting that it is undisclosed expert testimony. (Doc. 89 at 12.)

## IV. Discussion

The Court will grant summary judgment to Defendants. The Court finds that they have met their burden to establish that denial of the specialized diet furthers compelling government interests and is the least restrictive means of doing so; therefore, they have met their burden under RLUIPA. As to the First Amendment claim, considering the four factors of the *Turner* analysis, the Court finds that denial of the diet is reasonably related to legitimate penological goals.

### A. Substantial Burden on a Sincerely Held Religious Belief

#### 1. Sincerely held belief

Under both the RLUIPA and First Amendment analysis, Plaintiff must initially show that the religious practice at issue—consuming a diet that consists of all raw vegetarian foods—satisfies two criteria: (1) the proffered belief must be sincerely held and (2) the claim must be rooted in religious belief and not purely secular philosophical concerns. *Malik*, 16 F.3d at 333. The right to religious practice "is not limited to beliefs which are shared by all of the members of a religious sect." *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Plaintiff is therefore not required to show that consuming the requested raw-food vegetarian diet is mandated as a part of the Essene religion; rather, he is required to show that he sincerely believes that eating such a diet is consistent with his faith. *Shakur*, 514 F.3d at 884–85. Finally, the United States Supreme Court has stated that the question of sincerity "is, of course, a question of fact." *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

As Plaintiff notes, Defendants do not explicitly dispute the sincerity of Plaintiff's beliefs but offer facts suggesting lack of sincerity. (Doc. 89 at 7.) Specifically, they claim that Plaintiff did not identify himself as Essene when he was admitted to SCC. (DSOF ¶ 65.) Plaintiff explains that he has identified himself as Essene both before and after coming to SCC and that upon his admission to SCC, he was told by a prison official that the SCC computer could not list his religious preference as Essene. (PSOF ¶ 210.) Plaintiff asserts that his receipt of a mainline diet for nine months was so that he could barter with inmates to obtain food that more closely adhered to his religious beliefs. (*Id.* ¶ 226.) Defendants argue that Plaintiff was unable to find an expert who would opine that the Essene religion requires a raw-food vegetarian diet, and Thomas attests that he researched the Essene religion and that it does not require the raw-food diet that Plaintiff seeks. (DSOF ¶ 90, Thomas Aff. ¶¶ 66, 67.) But as noted above, Plaintiff is not required to show that consuming a raw-food vegetarian diet is mandated as a part of his religion; rather, he is required to show only that he sincerely believes that eating such a diet is consistent with his faith. *Shakur*, 514 F.3d at 884–85. It is improper for the Court to second-guess a particular individual's interpretation of his religious creeds. *Id.* at 884.

The Court finds that at best, Defendants have raised material questions of fact regarding Plaintiff's sincerely held beliefs. Defendants are not entitled to judgment as a matter of law on this issue.

#### 2. Substantial burden

Next, Plaintiff must demonstrate that Defendants substantially burden the practice of his religion by preventing him from eating his requested religious diet. *Id.* at 884–85. A substantial burden exists where the state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas*, 450

U.S. at 717–18, 101 S.Ct. 1425. Even where the compulsion to modify behavior may be indirect, "the infringement upon free exercise is nonetheless substantial." *Id.* at 718, 101 S.Ct. 1425.

 Defendants argue that although Plaintiff cannot practice his religion in the way he wishes, his religious practice is not so burdened that it renders religious exercise "effectively impracticable." (Doc. 85 at 6, citing *San Jose Christian College v. City of Morgan Hill,* 360 F.3d 1024, 1034–35 (9th Cir.2004).) Defendants point to other ways Plaintiff was able to practice his religion, such as observing communions and peace contemplations, practicing baptism, fasting, and prayer. (Doc. 85 at 7, DSOF ¶¶ 95–101.) Defendants also assert that Thomas offered Plaintiff his choice of two existing meals—the vegetarian and vegan—that would comply with Plaintiff's religious requirements. (Doc. 85 at 6, DSOF ¶ 37.) But Plaintiff disputes that these diets would comply. (Doc. 89 at 8; PSOF ¶¶ 177–179.) Moreover, Plaintiff asserts that there are no food items available in the commissary to supplement his religious diet because the foods are not raw vegetarian. (*Id.* ¶ 180.)

 Defendants have improperly imported into the RLUIPA analysis the second factor of the *Turner* test—alternative means of exercising religious rights, which applies to a First Amendment analysis. *See Warsoldier,* 418 F.3d at 994 (citing 42 U.S.C. § 2000cc–1(a)) (the "compelling government interest" and "least restrictive means" test replaced *Turner*'s "legitimate penological interest" test). As Plaintiff argues, alternative means of practicing his religion has no place in a RLUIPA analysis. (Doc. at 9.) As a result, Defendants have defined "religious exercise" too broadly. In *Greene v. Solano County Jail,* the Ninth Circuit noted that in *San Jose Christian College,* the court had considered the meaning of "religious exercise" in the context of a city's zoning process. 513 F.3d 982, 987 (9th Cir.2008). The *Greene* court stated that "[t]he analysis turned not on whether the owners of the school could practice their religion even without being able to construct a facility for religious education, but whether the denial of their application burdened a particular facet of their religious practice—the conversion of their land for the purpose of religious exercise." *Id.* In *Greene,* the court held that the plaintiff's "religious exercise" was not his ability to practice his religion as a whole, but his ability to engage in group worship, which was denied to him. *Id.* at 987. It further concluded that "an outright ban on a particular religious exercise is a substantial burden on that religious exercise." *Id. at* 988.

Thus, if Plaintiff establishes that his need for his requested religious diet is a sincerely held religious belief, denial of the diet is a substantial burden to his religious practice. The Court finds that on this record, there is a triable issue of fact as to substantial burden. The Court must therefore evaluate the merits of Plaintiff's claim under both RLUIPA and the First Amendment.

## B. RLUIPA Analysis

Because of RLUIPA's higher burden on the prison, the Court will address RLUIPA first.

### 1. Compelling government interest

The Court finds that Defendants submit evidence that the requested diet would have significant costs and administrative burdens, which would be inconsistent with a simplified food service, and that security in the kitchen would be adversely impacted; therefore, they establish compelling interests in denying the diet.

### a. Preliminary issue

Plaintiff argues that although RLUIPA applies to private prisons, there is no authority equating the interests of private prisons and the interests of the government for purposes of identifying "compelling governmental interests." (Doc. 89 at 10.)

As noted, courts have held that RLUIPA applies to private prisons. *Knows His Gun*, 866 F.Supp.2d at 1246. RLUIPA is intended to protect the religious exercise of people incarcerated in "institutions," 42 U.S.C. § 2000cc–1, and "institutions" include private prisons, 42 U.S.C. § 1997(1). Prisoners must be provided reasonable opportunities to exercise religious freedom. *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 925 (9th Cir.2011). In addition, RLUIPA defines "government" to include an "instrumentality" of a state government and "any other person acting under color of State law." 42 U.S.C. § 2000c–5(4)(A). Here, the Hawaii Department of Corrections delegated this responsibility to the CCA Defendants. Thus, the CCA and SCC Defendants may fairly be said to be state or "government" actors under RLUIPA. *See Knows His Gun*, 866 F.Supp.2d at 1246.

■ Furthermore, the statute should be construed as a whole. If private prisons are government actors for purposes of being covered by RLUIPA, the Court holds that they are government actors for purposes of identifying "compelling governmental interests." Plaintiff presents no authority to the contrary. And Plaintiff's interpretation would mean that under RLUIPA, prisoners in private prisons would have unfettered rights to practice their religion. He offers no authority to support this.

### b. Discussion

As noted, to analyze the merits of a RLUIPA claim, the Court determines whether Defendants' actions further a "compelling governmental interest" and do so by the least restrictive means." Defendants bear the burden on this.

■ First, the Court rejects. Defendants' argument that accommodation of Plaintiff's requested diet will suggest preferential treatment to other inmates, thereby creating security and safety risks, and that providing a customized menu for one inmate opens Defendants up to further equal protection claims by other inmates. (DSOF ¶¶ 26, 29.) *See Shakur*, 514 F.3d at 886, citing *Ward v. Walsh*, 1 F.3d 873, 879 (9th Cir.1993) (rejecting this argument absent specific findings by the district court of a serious problem). Defendants provide no specific evidence of such a problem, and the Court notes that SCC already provides several different diets to its inmate population.

■ But Defendants also argue that "[t]he prison has a legitimate interest in running a simplified food service, rather than one that gives rise to many administrative difficulties." (Doc. 85 at 7, citing *Ward*, 1 F.3d at 877.) Defendants assert that there are significant financial, administrative and operational difficulties associated with accommodating an inmate's request for an individually tailored diet and that preparing meals for Plaintiff in accordance with the sample menu is not feasible for a variety of reasons. (DSOF ¶¶ 118–147.) They argue that accommodating Plaintiff's request would impose an excessive and unjustified burden on prison operations. (*Id.* ¶ 22.) Specifically, SCC must serve three meals a day to a population of 1,600–1,900 inmates (4,800–6,000 meals per day); they argue that assigning even a portion of one kitchen employee's time and kitchen space, appliances and instruments to the preparation of meals for a single inmate would result in a disruption of the efficient management of food services for

prisoners, who must be fed in a timely and systematic fashion. (*Id.* ¶ 23). And they submit evidence of significant financial costs associated with providing the requested diet.

As noted, Plaintiff objects to evidence from Defendants' witness Susan Hoffman, arguing that she is an undisclosed expert who did not author an expert report. (Doc. 89 at 12.) Defendants reply that she is not being offered as an expert; rather, she will testify about operational concerns as it relates to food services provided by Trinity and as a fact witness; therefore, no report under Federal Rule of Civil Procedure 26(A)(2)(b) is required.[3] (Doc. 92 at 10–11.) To the extent that Defendants offer the averments of Huffman or LeClair as expert testimony, they do not dispute that the witness was not disclosed; the Court will exclude such evidence. *See Wong v. Regents of Univ. of Calif.*, 410 F.3d 1052, 1061 (9th Cir.2005) (affirming district court's exclusion at summary judgment of evidence of expert witnesses who were not timely disclosed).

Neither party offers any useful analysis on the issue of lay or expert testimony. Federal Rule of Evidence 701 addresses opinion testimony by a lay witness and provides that if a witness is not testifying as an expert, opinion testimony is limited to "one that is (a) rationally based on the witnesses perception; (b) helpful to clearly understanding the witnesses' testimony or to determining a fact in issue; and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." Rule 702 addresses testimony by expert witnesses and provides that expert testimony is based on "scientific, technical or other specialized knowledge." The commentary to Rule 701 states that courts have permitted the owner or officer of a business to testify as a lay witness to the value of projected profits or losses of a business; in other words, the witness need not be qualified as an expert. Fed. R.Evid., Advisory Committee Notes, 2000 Amendments. For example, in *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3rd Cir.1993), the district court permitted the owner of a franchise to testify to the damages he sustained, finding that in view of his experience in the quick-lube business, he was qualified to predict how well his business could have been expected to do; he, in fact, offered calculations of future profits; and he based his testimony on his costs. *Id.* at 1174–75. The Third Circuit Court of Appeals affirmed, holding that the witness was not required to qualify as an expert to offer opinion concerning the lost profits of his business. *Id.* at 1175. *See also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2nd Cir.1995); *Burlington Northern R.R. Co. v. Nebraska*, 802 F.2d 994, 1005 (8th Cir. 1986) (finding an abuse of discretion for the district court to exclude lay testimony by railroad executives as to the safety of cabooseless trains based on the executives' years of experience in the business and a review of accident reports).

The Court finds that Huffman was not required to qualify as an expert to offer opinion testimony as to the added costs to Trinity to provide Plaintiff the requested specialized diet or the role that Trinity plays in kitchen supervision and security. She attests that she is the Regional Vice President of Trinity, the SCC food service company, and also served as the Director of Projects for Trinity and as the Director of Projects for Trinity's predecessor at SCC, that she serves as Trinity's principle liaison with CCA and provides general administrative, financial, and

---

**3.** Plaintiff and Defendants make the same arguments as to the affidavit of witness Laurie LeClair.

managerial support, and that she offers her evidence based on her personal knowledge and knowledge made available to her in her role as Regional Vice President. (DSOF, Ex. E ¶¶ 1–2.) Plaintiff does not complain that she lacks personal knowledge. The objection is overruled.

Plaintiff also argues that Defendants incorrectly claim that certain food items, such as bananas and tomatoes, are not served at SCC; Plaintiff asserts that these items are, in fact, served because he receives them at holiday meals. (Doc. 90, Pl.Decl.¶ 116.) Likewise, he claims that items like seed, nuts, and dried fruit need not be purchased from the grocery store because they can be purchased wholesale in quantities of 25 to 30 lb. bags. (*Id.* ¶ 117.) But Plaintiff's own testimony suggests that some foods—like tomatoes and bananas—are specialty items at SCC, and Plaintiff offers no evidence as to the cost of items purchased in 25 lb. bags, nor does he address storage issues or the feasibility of buying such large quantities of items for a single diet. He asserts that Defendants need not provide raw milk cheese but only food with "as little processing as possible." (*Id.* at 18.) But raw milk cheese is what Plaintiff requested; moreover, he does not claim that he can eat the cheese presently served at SCC, so there would still be a need to obtain a food item different than what is currently served.

Plaintiff contends that his requested meals require no cooking, so there are no pots and pans to wash; fruits and vegetables do not require cutting and are simply placed on a tray, which is a small task; and many of the food items are already served at SCC as part of other menus,

such as cabbage and lettuce wedges of approximately the normal one cup serving size to inmates that receive Kosher meals. (PSOF ¶¶ 190–193, 195.) Even assuming this is true, Defendants' witness attests to the cost of purchasing items only available through other suppliers and vendors. Plaintiff also alleges he has served in the kitchen and that the meals could be prepared by inmate kitchen workers which are currently paid to work in the SCC kitchen at the rate of twenty-five cents an hour. (*Id.* ¶¶ 194–195.) The Court notes that his requested diet seeks whole fruits and vegetables, but also seeks wedges of cabbage and lettuce, which presumably would not be provided whole. (DSOF, Ex. B, Attach.A.) Regardless, Defendants provide no specific evidence regarding the cost of separate preparation of meals; therefore, the Court's analysis does not rely on such costs.

Plaintiff also asserts that Defendants admitted that other inmates have requested an Essene diet. (PSOF ¶ 196, Ex. 3, Interrog. No. 6.) But some evidence suggests that not all Essene diets consist of raw foods. (DSOF, Ex. B, Attach. D, letter, dated June 27, 2013, from the World Center of the Essene Christian Church). Plaintiff provides no evidence that other inmates have requested the same diet he seeks. Thus, to the extent that Plaintiff may be suggesting there will be economies of scale, his evidence is not probative. The Court finds that Plaintiff fails to create a dispute of fact as to the estimated costs of providing his requested diet.

▬ Defendants also claim that Plaintiff's requested diet is nutritionally inadequate,[4] and Plaintiff objects to the evi-

---

4. LeClair states that Plaintiff's proposed sample menu fails to comply with the NAS–NRC's nutritional standards because it provides less than the NAS–NRC's RDA for several nutrients; specifically, the menu is deficient in Vitamin B12, Vitamin D and Iodine. (DSOF ¶ 109.) Additionally, approximately half of

the calories provided under the sample menu are derived from fat, and the NAS–NRC guidelines, provide that no more than 30% of the calories consumed by a sedentary adult male should be derived from fat. (*Id.* ¶¶ 111–112.) The menu proposed also greatly ex-

dence on the ground of undisclosed expert witness testimony. (Doc. 89 at 12.) The Court sustains the objection. Although the dietician can testify as a lay witness that she prepares menus to provide nutritionally adequate meals, the Court finds that her testimony regarding the inadequacy of Plaintiff's proposed diet is "expert, scientific, or other specialized knowledge."

The Court finds that the evidence shows a compelling interest in denying a specialized meal plan that would be very expensive to provide. Plaintiff fails to create a triable issue of fact regarding Defendants' assertion that the approximate annual cost to provide Plaintiff with the requested meals would be between $24,627.85 and $27,205.50. The food alone has an approximate cost of $8212.50 annually as compared to the next most expensive diet with an annual cost of $1,226.40. In addition, the cost to procure the food is considerable—Defendants estimate annual costs of $12,889.76 to $15,467.40. This is necessarily over and above the costs of procuring foods for other diets, which are purchased in bulk and delivered by vendors. Providing the requested diet would be inconsistent with a simplified, efficient food service. *See Baranowski v. Hart,* 486 F.3d 112, 125 (5th Cir.2007); *Linehan v. Crosby,* 346 Fed.Appx. 471, 473 (11th Cir.2009) (unpublished) (compelling interest in keeping down costs); *Curry v. Cal. Dep't. of Corrs.,* 2013 WL 75769, at *9 (N.D.Cal. Jan. 4, 2013) (finding a compelling interest to limit the inmate to currently-available diets where the evidence showed · that a customized Kemetic/vegan-organic diet of raw whole fruits and vegetables resulted in $50,000 to $60,000 increased expense); *Cotton v. Cate,* 2012 WL 1094237, at *8 (N.D.Cal. Mar. 29, 2012) (finding that limiting Plaintiff to currently-available diets instead of a customized Kemetic/vegan-or-

ganic diet was the least restrictive means of maintaining appropriate prison security where Plaintiff required specialty items be purchased from unknown vendors or unlicensed food vendors that that would not deliver to prisons); *Phipps v. Morgan,* 2006 WL 543896, at *9 (E.D.Wash. Mar. 6, 2006) (finding that providing ovo-lacto vegetarian meals was the prison system's least restrictive means of furthering the compelling interests of reducing costs, streamlining food production, limiting the number of required staff, maintaining consolidation of vendors, and limiting security risks).

■ In addition to financial costs, the undisputed evidence shows that procuring the specialized diet would create a security issue concerning contraband because the Trinity food service employee, who helps to maintain appropriate supervision over inmates, would be required to be off-site and unable to attend to supervisory responsibilities in the kitchen. In other words, diverting staff to travel to purchase food would create a security gap. Moreover, the Trinity staff member who travelled off-site to procure Plaintiff's food would have to be separately searched when returning to the prison with the needed items. The danger of contraband in a prison setting is well settled, and deterring its possession is a legitimate penological justification. *See Florence v. Bd. of Chosen Freeholders of County of Burlington,* 566 U.S. ——, 132 S.Ct. 1510, 1517, 182 L.Ed.2d 566 (2012) (upholding a policy requiring strip searches of all arrestees assigned to general population because evidence showed that even people arrested for · minor offenses sometimes tried to smuggle contraband into jail facilities or could be coerced to do so); *Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (noting that "smug-

ceeds the NAS–NRC's RDA for Copper. (*Id.* ¶ 114).

gling of money, drugs, weapons, *and other contraband is all too common an occurrence.*") (Emphasis added.); *Byrd v. Maricopa County Sheriff's Dep't,* 629 F.3d 1135, 1143 (9th Cir.2011) (justification for a strip search was reasonable because the search was initiated due to several recent fights and suspicion of contraband); *Bull v. City and County of San Francisco,* 595 F.3d 964, 975 (9th Cir.2010) (the record showed a pervasive and serious problem with contraband).

### 2. Least restrictive means

Plaintiff claims there is a disputed issue of fact about whether Defendants meaningfully considered Plaintiff's diet request before rejecting it because on August 19, 2013, they responded to interrogatories that they did not know the cost. (Doc. 89 at 12.) But as Defendants observe, the interrogatory sought the "exact cost" of providing the requested diet, and Defendants responded that they could not provide such a cost considering the variables and that the food service is provided by a third-party. (Doc. 92 at 6.)

■ The Court finds that Defendants have met their burden to show that rejection of the raw vegetarian diet was the least restrictive means to further the compelling government interest of cost containment and security. Defendants' evidence shows that they considered and rejected the possibility of providing the requested diet and found that the existing vegetarian diet would reasonably accommodate Plaintiff's religious needs. There is no easy or inexpensive way to accommodate Plaintiff's requests while still operating a food service that provides 4,800 to 6,000 inmate meals per day. Although Plaintiff offers his opinion as to the ease of preparing his meals, he offers no evidence to controvert Defendants' evidence on the financial or security burdens of ac-

commodating his request. *See Curry,* 2013 WL 75769, at *8–10.

■ The Court also rejects Plaintiff's argument that because Defendants do not show that they considered transferring Plaintiff to another prison, Defendants failed to meet their burden on least restrictive means. Plaintiff cites no authority to support his argument that prison officials must consider a transfer to accommodate a religious diet, and there is no evidence that prior to his response to the motion, he ever made a request for a transfer in order to receive a religious diet. (*See* Doc. 90, Pl. Decl. ¶ 178 suggesting a transfer to Hawaii.)

### C. First Amendment

As noted, to determine the merits of Plaintiff's First Amendment claim, the Court must consider the four *Turner* factors to determine if prison officials show a reasonable relationship between the policy of denying the requested diet and legitimate penological goals; the relationship must be more than just logical. *See Beards v. Banks,* 548 U.S. 521, 533, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006).

■ Although Defendants make no specific arguments regarding *Turner,* their evidence shows a legitimate interest in denying the specialized diet in order to operate a simplified food service and avoid excessive costs as well as avoid diverting personnel from inmate supervision. *Curry,* 2013 WL 75769, at *13. Limiting special religious dietary options and thereby saving money serves a legitimate penological interest. *Ward,* 1 F.3d at 879; *Curry,* 2013 WL 75769, at *13 ("The orderly administration of a program that allows ... prisons to accommodate the religious dietary needs of thousands of prisoners" is a legitimate governmental interest.) This factor weighs in favor of Defendants.

The second *Turner* factor is whether Plaintiff has other means of religious ex-

pression. *Id.* at 877. Defendants assert that Plaintiff is able to observe communions and peace contemplations and to practice baptism, fasting, and prayer, and to engage in self-study and order religious texts. (Doc. 85 at 7, DSOF ¶¶ 95–101.) Plaintiff objects to this evidence, stating it is "disputed. Lacks foundation. Vague and ambiguous. Dean maintains that being forced to violate his dietary laws make him unable to fully observe" each of those activities. (PSOF ¶¶ 95–101.) But Plaintiff offered testimony at his deposition that he was able to fast, pray, and engage in peace contemplations and self-study. (DSOF, Ex. C at 49:10–18 (fasting), 53:13–17 (prayers), 58:6–14 (seven peace contemplations), 92;8–14 (self-study and religious texts). The Court overrules Plaintiff's objections as to those matters.

Also relevant to this second *Turner* factor is "the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his soul." *Ward,* 1 F.3d at 878 (considering an Orthodox Jewish inmate's claim that he was denied a Kosher diet); *Henderson v. Terhune,* 379 F.3d 709, 714 (9th Cir.2004) (second *Turner* factor supports the plaintiff because, "[l]ike asking an Orthodox Jew to eat non-Kosher food, cutting [the plaintiff's] hair involves a strict religious prohibition about the sanctity and purity of the body, and the concern we identified in *Ward* is heightened"). Plaintiff states in his declaration that to eat raw vegetarian diet is not a mere recommendation but rather to eat cooked foods is to defile a believer. (PSOF ¶ 177, Pl. Decl. ¶ 3.) The Court will assume for this analysis that cooked foods are forbidden. Therefore, this factor weighs in favor of Plaintiff.

As to the third factor—the impact of accommodating Plaintiff's request—the evidence shows that accommodating the diet request would adversely affect kitchen staff and security because it would divert supervisory personnel for the purpose of shopping for and delivering Plaintiff's special foods. In addition, there would necessarily be some individualized preparation of Plaintiff's meals in a system that prepares food in bulk and services thousands of meals per day. Although, there is no evidence as to whether there is a fixed budget for food services and therefore no evidence how or if extraordinary costs for one inmate's meals would impact meals served to other inmates, this factor weighs in favor of Defendants.

Other than proposing a transfer, Plaintiff has not offered any "ready alternatives"—the fourth factor—to accommodating Plaintiff's First Amendment rights at a *de minimis* cost to prison resources. Again, the Court rejects this as a ready alternative.

Considering the four *Turner* factors, the Court finds that Defendants' religious diet policy to refuse Plaintiff's request for a raw-food vegetarian diet is reasonably related to legitimate penological goals and there is no First Amendment violation.

Because the Court finds no triable issue of fact as to a RLUIPA claim or First Amendment claim, there is no need to reach Defendants' remaining arguments. **IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 85).

(2) Defendant's Motion for Summary Judgment (Doc. 85) is **granted,** and the claims are dismissed with prejudice.

(3) The action is terminated, and the Clerk of Court must enter judgment accordingly.